1
2
3

**UNITED STATES DISTRICT COURT**

4

**DISTRICT OF CONNECTICUT**

5
6

| | |
|---|---|
| **YOSELIN MARTINEZ, on behalf of herself and all others similarly situated,** | **CASE NO.:** |
| | **CLASS ACTION** |
| **Plaintiff** | **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF** |
| **v.** | |
| **UNIVERSITY OF CONNECTICUT and UCONN HEALTH,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

1

Plaintiff Yoselin Martinez ("Plaintiff"), individually by and through her undersigned counsel, brings this class action lawsuit against the University of Connecticut and UCONN Health (collectively "UCONN"), on behalf of herself and all others similarly situated, and alleges, based upon information and belief and the investigation of her counsel, as follows:

## INTRODUCTION

1.      This is a putative class action lawsuit brought by current and former patients of UCONN Health against UCONN for its failure to properly secure and safeguard their personally identifiable information ("PII") and protected health information ("PHI"), and for their failure to provide timely, accurate and adequate notice that such PII had been compromised.

2.      On February 25, 2019, UCONN announced that hacker gained access to a number of employee email accounts through a phishing attack which subsequently exposed the personal data of more than 326,000 UCONN Health patients. The exposed personal information included patients' names, dates of birth, addresses, medical information and Social Security numbers. ("Data Breach" or "Breach").

3.      According to the Notice of Data Security Incident ("Notice") issued by UCONN, an unauthorized third party illegally accessed a number of UCONN Health employee email accounts.[1] This led to the exposure of personally identifiable information belonging to more than 326,000 UCONN Health patients.

4.      Although it has not directly told patients such information, UCONN has said publicly that patient PII/PHI was first compromised in August 2018.  And while the Breach was discovered by UCONN on December 24, 2018, patients were not notified until nearly two months later.

5.      Phishing attacks – the kind that led to the Data Breach -- are a well-known phenomenon for which there are a number of proactive and preventative measures. This Data Breach occurred, however, only because UCONN failed to implement adequate and reasonable cyber-

---

[1] https://health.uconn.edu/securityincident (last visited on March 4, 2019)

security procedures and protocols. Among other things, Defendants failed to exercise reasonable care, and to implement adequate cyber-security training, including, but not limited to, how to spot phishing e-mails from unauthorized senders.

6.     The deficiencies in Defendants' data security protocols were so significant that the Breach likely remained undetected for months.

7.     Intruders, therefore, had months to access, view and steal patient data unabated. During this time, UCONN failed to recognize its systems had been breached and that intruders were stealing data on hundreds of thousands of current and former patients. Timely action by UCONN would likely have significantly reduced the consequences of the Breach.

8.     UCONN disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to disclose to its patients the material fact that it did not have adequate computer systems and security practices to safeguard their PII, failing to take available steps to prevent the Data Breach, failing to monitor and timely detect the Data Breach, and failing to provide Plaintiff and Class members prompt and accurate notice of the Data Breach.

9.     Plaintiff and Class members seek to remedy the harms suffered as a result of the Data Breach and have a significant interest in ensuring that their PII, which remain in UCONN's possession, is protected from further breaches.

10.     No one can know what else the cyber criminals will do with the compromised PII/PHI.  However, what is known is that UCONN Health patients will be for the rest of their lives at a heightened risk of further identity theft and fraud.

11.     Defendants' conduct gives rise to claims for breach of contract and negligence. Plaintiff, individually, and on behalf of those similarly situated, seeks to recover damages, equitable relief, injunctive relief designed to prevent a reoccurrence of the Data Breach and resulting injuries, restitution, disgorgement, reasonable costs and attorney fees, and all other remedies this Court deems proper.

**PARTIES**

12.     Plaintiff Yoselin Martinez is a resident of New London, Connecticut and a patient of UCONN Health. On or about February 25, 2019 Ms. Reyes received notice from UCONN Health that her PII/PHI, along with approximately 326,000 patients, had been improperly exposed to unauthorized third parties.

13.     Shortly after receiving notice from UCONN Health, Ms. Martinez checked her bank account which had been placed into overdraft. Upon speaking with a bank representative, Ms. Martinez was informed that the charge was a result of a fraudulent transaction on her account.

14.     In addition to the fraudulent activity currently affecting Ms. Martinez as a result of the Breach, she will continue to be at heightened risk for financial fraud and identity theft and their attendant damages for years to come.

15.     Defendant University of Connecticut  is a public land grant, National Sea Grant and National Space Grant research university founded in 1881 and located in Storrs, Connecticut.

16.     Defendant UCONN Health is a branch of the University of Connecticut that oversees clinical care, advanced biomedical research, and academic education in medicine. It is a teaching hospital with 224 beds, emergency and out-patient services.

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative class members, and at least some members of the proposed Class have a different citizenship from UCONN.

18.     This Court has jurisdiction over Defendants as they operate in this District, and their computer systems implicated in this Breach are based in this District.

19.     Plaintiff was a patient of UCONN Health and engaged in underlying health services within this District where her PII was also maintained, and where the breach occurred which led to her sustaining damage.  Through its business operations in this District, UCONN intentionally avails

itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District, UCONN is based in this District, maintains patient PII in the District and has caused harm to Plaintiff and Class members residing in this District.

## STATEMENT OF FACTS

### *Background*

21.     Cyber-attacks come in many forms. Phishing attacks are among the oldest and well known.  In simple terms, phishing is a method of obtaining personal information using deceptive e-mails and websites. The goal is to trick an e-mail recipient into believing that the message is something they want or need from a legitimate or trustworthy source and to subsequently click on link or download an attachment. The fake link will typically mimic a familiar website and require the input of credentials. Once input, the credentials are then used to gain unauthorized access into a system.  "It's one of the oldest types of cyberattacks, dating back to the 1990s" and one that every organization with an internet presence is aware."[2]

22.     Phishing attacks are well known and understood by the cyber-protection community and there are many well-known proactive measures that can be undertaken to prevent phishing attacks such as "sandboxing" inbound e-mail[3], inspecting and analyzing web traffic, pen-testing an organization to find weak spots, and employee education, among many others.[4]

---

[2] https://www.csoonline.com/article/2117843/phishing/what-is-phishing-how-this-cyber-attack-works-and-how-to-prevent-it.html. (last visited February 11, 2019)

[3] An automated process whereby e-mails with attachments and links are segregated to an isolated test environment, a "sandbox," wherein a suspicious file or URL may be executed safely.
[4] https://www.csoonline.com/article/2117843/phishing/what-is-phishing-how-this-cyber-attack-works-and-how-to-prevent-it.html. (last visited February 11, 2019)

23.     Data breaches, including those perpetrated by phishing attacks, have become widespread. In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a forty percent increase in the number of data breaches from the previous year.[5]   In 2017 a new record high of 1,579  breaches were reported representing a 44.7 percent increase over 2016.[6]

### *The UCONN Health Data Breach*

24.     On December 24, 2018, Defendants discovered that an unauthorized third party gained access to UCONN Health's patient records through the use of phishing e-mails sent to UCONN Health employees.  Due to UCONN's inadequate protocols and procedures to prevent such attacks, unauthorized parties gained unfettered access to the PII/PHI of approximately 326,000 current and former patients.[7]

25.     But not until on or about February 25, 2019, did UCONN publicly announced that its system had been compromised by unauthorized third parties. The announcement came two months after they first noticed their system had been compromised. UCONN made no statement as to when the breach first occurred, or how long the privacy of patient PII had been compromised. The announcement stated:

**Notice of Data Security Incident**

UConn Health recently learned that an unauthorized third party illegally accessed a limited number of employee email accounts. Upon learning of the incident, we immediately took action, including securing the impacted accounts to prevent further unauthorized access and confirming the security of our email system. We also notified law enforcement and retained a leading forensic security firm to

---

[5] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/surveys-studys/ (last visited January 23, 2019).
[6] Identity Theft Resource Center, 2017 Annual Data Breach Year-End Review, available at https://www.idtheftcenter.org/2017-data-breaches/ (last visited January 23, 2019).
[7] UConn Health Among the Latest Phishing Victims, February 25, 2019. https://www.bankinfosecurity.com/uconn-health-among-latest-apparent-phishing-victims-a-12048 (last visited March 4, 2019).

investigate and conduct a comprehensive search for any personal information in the impacted email accounts.

On December 24, 2018, we determined that the accounts contained some personal information, including some individuals' names, dates of birth, addresses and limited medical information, such as billing and appointment information. The accounts also contained the Social Security numbers of some individuals.

At this point, we are not aware of any fraud or identity theft to any individual as a result of this incident, and do not know if any personal information was ever viewed or acquired by the unauthorized party. Nevertheless, because we cannot isolate exactly what, if any, information may have been accessed, we notified individuals whose information was in the impacted accounts. The incident had no impact on our computer networks or electronic medical record systems.

We have mailed notification letters to potentially impacted individuals for whom we have a valid mailing address. That notice includes information on steps individuals can take to protect themselves against potential fraud or identity theft. In addition, we are offering free identity theft protection services to individuals whose Social Security numbers may be impacted. As a general matter, we recommend that individuals regularly monitor credit reports, account statements and benefit statements. If individuals detect any suspicious activity, they should notify the entity with which the account is maintained, and promptly report the suspicious activity to appropriate law enforcement authorities, including the police and their state attorney general. In addition, anyone looking for information on fraud prevention can review tips provided by the FTC at www.ftc.gov/idtheft.

We take our responsibility to safeguard personal information seriously and apologize for any inconvenience or concern this incident might cause. We have taken and will continue to take steps to help prevent something like this from happening again, including evaluating additional platforms for educating staff and reviewing technical controls.

Individuals with questions may call our dedicated toll-free inquiry line at 1-877-734-5353 between 9 a.m. and 9 p.m. Eastern Time, Monday through Friday.[8]

26.    UCONN has now confirmed that the breach happened in August 2018.[9]

---

[8] Notice of Data Security Incident, available at https://health.uconn.edu/securityincident (last visited March 4, 2019).

[9] NBCNewsConnecticut, How the UConn Health Data Breach Unfolded, available at https://www.nbcconnecticut.com/investigations/How-the-UConn-Health-Data-Breach-Unfolded-507214861.html (last visited March 16, 2019).

CLASS ACTION COMPLAINT

27.    UCONN has not advised as to why it waited 6 months to advise patients that their information had been compromised as a result of the breach.

**UCONN's Inadequate Cyber-Security Practices**

28.    Prior to the Data Breach, UCONN advised in the Notice of Privacy Practices posted on its website that it "is committed to protecting the privacy of your medical, dental and billing information."[10]

29.    UCONN further acknowledged that it is "required by law to make sure that protected health information that identifies you is kept private."[11]

30.    UCONN represented that it would abide by these obligations, but failed to live up to its own promises, as well as its duties and obligations required by law and industry standards.

31.    Contrary to its promises, UCONN's conduct has instead been a direct cause of the impermissible release, disclosure, compromise, and publication of Class members' PII/PHI, as well as the ongoing harm to Plaintiff and other Class members.

32.    UCONN could have prevented this Data Breach which was based on a long and well-known hacking technique known as phishing, for which there are numerous and effective countermeasures.

33.    Generally, organizations can mount two primary defenses to phishing scams: employee education and technical security barriers.

34.    Employee education is the process of adequately making employees aware of common phishing scams and implementing company-wide policies requiring unknown links, attachments or requests to be sequestered and checked for authenticity. Employee education and established protocols for use of log-in credentials is the easiest method to assist employees in properly identifying fraudulent e-mails and prevent unauthorized access to personal information.

---

[10] Notice of Privacy Practices, available at https://health.uconn.edu/wp-content/uploads/2017/11/summary_notice_privacy_practices.pdf (last visited March 14, 2019).
[11] Disclaimers/Privacy available at https://health.uconn.edu/disclaimersprivacy (last visited March 14, 2019.)

35.     Organizations like UCONN can also greatly reduce the flow of phishing e-mails by implementing certain security measures governing e-mail transmissions. For example, organizations can use a simple e-mail validation system that allows domain owners to publish a list of IP addresses that are authorized to send e-mail on their behalf to reduce the amount of spam and fraud by making it much harder for malicious senders to disguise their identities. Organizations can also use e-mail authentication protocols that block e-mail streams which have not been properly authenticated.

36.     Unfortunately, UCONN failed to employ any of these defenses to the detriment of Plaintiff and hundreds of thousands of Class members. As evidenced by the success of the phishing hack, it is clear that UCONN failed to ensure that its employees were adequately trained on even the most basic of cybersecurity protocols, including:

    a.  How to detect phishing e-mails and other scams including providing employees examples of these scams and guidance on how to verify if e-mails are legitimate;

    b.  Effective password management and encryption protocols for internal and external e-mails;

    c.  Avoid responding to e-mails that are suspicious or from unknown sources;

    d.  Locking, encrypting and limiting access to computers and files containing sensitive information; and

    e.  Implementing guidelines for maintaining sensitive data.

37.     UCONN's failures handed criminals patient PII/PHI and put Plaintiff and members of the Class at serious, immediate and ongoing risk for identity theft and fraud.

38.     The Data Breach was caused by UCONN's failure to abide by best practices and industry standards concerning the security of its computer systems.  UCONN did not comply with security standards and allowed its patients' PII/PHI to be compromised by failing to implement security measures that could have prevented or mitigated the Data Breach.

39.     UCONN failed to ensure that all its personnel with access to patient records were made aware of this well-known and well-publicized type of scam.

40.     In addition, upon information and belief, UCONN failed to take reasonable steps to clearly, conspicuously, and timely inform Plaintiff and the other Class members of the nature and extent of the Data Breach.  By failing to provide adequate and timely notice, UCONN prevented Plaintiff and Class members from protecting themselves from the consequences of the Data Breach.

### *Value of Personally Identifiable Information*

41.     UCONN was well-aware, or reasonably should have been aware, that the PII/PHI it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

42.     Indeed, on its website, UCONN acknowledges that "medical/dental/billing information about you and your health is personal and confidential."[12]

43.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[13]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[14]

44.     Personal identifying information is a valuable commodity to identity thieves once the information has been compromised.  As the FTC recognizes, once identity thieves have personal information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."[15]

45.     Identity thieves can use personal information, such as that of Plaintiff and Class members, which UCONN failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's

---

[12] Disclaimers/Privacy available at https://health.uconn.edu/disclaimersprivacy (last visited March 14, 2019.)
[13] 17 C.F.R § 248.201 (2013).
[14] *Id.*
[15] Federal Trade Commission, *Warning Signs of Identity Theft*, available at: https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited January 23, 2019).

CLASS ACTION COMPLAINT

1    picture; using the victim's information to obtain government benefits; or filing a fraudulent tax

2    return using the victim's information to obtain a fraudulent refund.

3        46.    A "cyber black market" exists in which criminals openly post stolen social security

4    numbers and other personal information on multiple underground Internet websites. Such data is

5    valuable to identity thieves because they can use victims' personal data to open new financial

6    accounts, take out loans in another person's name and/or incur charges on existing accounts.

7        47.    Professionals tasked with trying to stop fraud and other misuse know that PII/PHI has

8    real monetary value in part because criminals continue their efforts to obtain this data.[16] In other

9    words, if any additional breach of sensitive data did not have incremental value to criminals, one

10   would expect to see a reduction in criminal efforts to obtain such additional data over time.

11   However, just the opposite has occurred. According to the Identity Theft Resource Center, 2017 saw

12   1,579 data breaches, representing a 44.7 percent increase over the record high figures reported a year

13   earlier.[17]

14       48.    At all relevant times, UCONN knew, or reasonably should have known, of the

15   importance of safeguarding PII/PHI and of the foreseeable consequences that would occur if its data

16   security system was breached, including, the significant costs that would be imposed on its patients

17   as a result of a breach.

18

19   ***The Effects of Unauthorized Disclosure of PII/PHI***

20       49.    The ramifications of the UCONN's failure to keep its patients' PII/PHI secure are

21   long lasting and severe.  Once PII/PHI is stolen, fraudulent use of that information and damage to

22   victims may continue for years.

23

24

---

25   [16] *Data Breaches Rise as Cybercriminals Continue to Outwit IT*, *CIO Magazine*,

26   https://www.cio.com/article/2686167/data-breach/data-breaches-rise-as-cybercriminals-continue-to-outwit-it.html (last visited January 23, 2019).

27   [17] *2017 Annual Data Breach Year-End Review,* https://www.idtheftcenter.org/2017-data-breaches, (last visited January 23, 2019).

28

---

CLASS ACTION COMPLAINT

50.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later.

51.     Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

52.     Moreover, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

53.     Additionally, the information compromised in the Data Breach is significantly more valuable than the mere loss of credit card information typical of recent large retailer data breaches. The PII/PHI compromised in the UCONN's Data Breach is difficult, if not impossible, to change (i.e. Social Security numbers, names, addresses, dates of birth and medical records).

54.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card

---

[18] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited February 13, 2019).

CLASS ACTION COMPLAINT

information, personally identifiable information and Social Security numbers are worth more than

10x on the black market."[19]

55.     It is well known and the subject of many media reports that PII/PHI is highly coveted

and a frequent target of hackers.  This information is targeted not only for identity theft purposes, but

also for committing healthcare fraud, including obtaining medical services under another's

insurance.  A study by Experian found that the "average total cost" of medical identity theft is "about

$20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-

of-pocket costs for healthcare they did not receive in order to restore coverage.[20]  Despite well

publicized litigation and frequent public announcements of data breaches by medical and technology

companies, Defendants opted to maintain an insufficient and inadequate system to protect the PHI

and PII of Plaintiff and Class Members.

56.     Unfortunately, and as is alleged below, despite all of this publicly available

knowledge of the continued compromises of PII and PHI in the hands of third parties, such as health

companies, Defendants' approach at maintaining the privacy of the Plaintiff's and the Class

Members' PII and PHI was lackadaisical, cavalier, reckless, or at the very least negligent.

***Plaintiff and Class Members Suffered Damages***

57.     The PII/PHI belonging to Plaintiff and Class members is private and sensitive in

nature and was left inadequately protected by UCONN. UCONN did not obtain Plaintiff's or Class

members' consent to disclose their PII to any other person as required by applicable law and industry

standards.

---

[19] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited February 13, 2019).
[20] Elinor Mills, *Study:   Medical  identity  theft  is  costly  for  victims*, available at: https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last  visited  March 16, 2019).

1    58.    The Data Breach was a direct and proximate result of UCONN's failure to: properly

2    safeguard and protect Plaintiff's and Class members' PII/PHI from unauthorized access, use, and

3    disclosure, as required by various state and federal regulations, industry practices, and the common

4    law; UCONN's failure to establish and implement appropriate administrative, technical, and

5    physical safeguards to ensure the security and confidentiality of Plaintiff's and Class members' PII;

6    and protect against reasonably foreseeable threats to the security or integrity of such information.

7    59.    UCONN had the resources necessary to prevent a breach, but neglected to adequately

8    invest in data security, despite the growing number of well-publicized data breaches.

9    60.    Had UCONN remedied the deficiencies in its data security systems, adopted security

10   measures recommended by experts in the field, UCONN would have prevented intrusion into its

11   systems and, ultimately, the theft of PII/PHI belonging to its patients.

12   61.    As a direct and proximate result of UCONN's wrongful actions and inaction and the

13   resulting Data Breach, Plaintiff and Class members have been placed at an imminent, immediate,

14   and continuing increased risk of harm from identity theft and identity fraud, requiring them to take

15   the time which they otherwise would have dedicated to other life demands such as work and family

16   in an effort to mitigate the actual and potential impact of the Data Breach on their lives including,

17   *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial

18   institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit

19   reports and accounts for unauthorized activity, and filing police reports. This time has been lost

20   forever and cannot be recaptured.

21   62.    The ramifications of Defendants' failure to keep Plaintiff's and Class Members' data

22   secure are severe.  As explained by the Federal Trade Commission:

23       Medical identity theft happens when someone steals your personal
         information and uses it to commit health care fraud. Medical ID
24       thieves may use your identity to get treatment — even surgery — or to
         bilk insurers by making fake claims. Repairing damage to your good
25       name and credit record can be difficult enough, but medical ID theft
         can have other serious consequences. If a scammer gets treatment in
26       your name, that person's health problems could become a part of your
         medical record. It could affect your ability to get medical care and
27       insurance benefits, and could even affect decisions made by doctors

28

treating you later on. The scammer's unpaid medical debts also could
end up on your credit report.[21]

63.     PII/PHI—like the type disclosed in the breach—is particularly valuable for

cybercriminals. According to SecureWorks (a division of Dell Inc.), "[i]t's a well known truism

within much of the healthcare data security community that an individual healthcare record is worth

more on the black market ($50, on average) than a U.S.-based credit card and personal identity with

social security number combined."[22] The reason is that thieves "[c]an use a healthcare record to

submit false medical claims (and thus obtain free medical care), purchase prescription medication, or

resell the record on the black market."[23]

64.     Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry

Notification, advised:

> Cyber criminals are selling [medical] information on the black market
> at a rate of $50 for each partial EHR, compared to $1 for a stolen
> social security number or credit card number. EHR can then be used to
> file fraudulent insurance claims, obtain prescription medication, and
> advance identity theft. EHR theft is also more difficult to detect, taking
> almost twice as long as normal identity theft.[24]

65.     Once use of compromised non-financial PII/PHI is detected, the personal an

economic consequences to the data breach victims can be overwhelming. As reported by

CreditCards.com:

> The Ponemon Institute found that 36 percent of medical ID theft
> victims pay to resolve the issue, and their out-of-pocket costs
> average nearly $19,000. Even if you don't end up paying out of

---

[21] Federal Trade Commission, *Medical ID Theft:  Health Information for Older People*, available at
https://www.consumer.ftc.gov/articles/0326-medical-id-theft-health-information-older-people (last
visited March 16, 2019).
[22] *What's the Market Value of a Healthcare Record,* Dell SecureWorks (Dec. 13, 2012),
https://www.secureworks.com/blog/general-market-value-of-a-healthcare-record (last visited March
16, 2019).
[23] Id.
[24] Federal Bureau of Investigation, *FBI Cyber Division Private Industry Notification* (Apr. 8, 2014),
https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf (last visited March 16, 2019).

pocket, such usage can wreak havoc on both medical and credit records, and clearing that up is a time-consuming headache. That's because medical records are scattered. Unlike personal financial information, which is consolidated and protected by credit bureaus, bits of your medical records end up in every doctor's office and hospital you check into, every pharmacy that fills a prescription and every facility that processes payments for those transactions.[25]

66.    Research by Ponemon confirms that medical identity theft is costly and complex to resolve, and therefore it is critical for healthcare providers to take additional steps to assist victims resolve the consequences of the theft and prevent future fraud. In a 2014 study, Ponemon found that sixty-five percent (65%) of victims of medical identity theft in the study had to pay an average of $13,500 to resolve the resultant crimes[26], and only ten percent (10%) of those in the study reported having achieved complete satisfaction in concluding the incident.

67.    The average time spent by those respondents who successfully resolved their situation was more than 200 hours, working with their insurer or healthcare provider to make sure their personal medical credentials were secure and verifying the accuracy of their personal health information, medical invoices and claims, and electronic health records. Indeed, fifty-nine percent (59%) of the respondents reported that their information was used to obtain healthcare services or treatments, and fifty-six percent (56%) reported that their information was used to obtain prescription pharmaceuticals or medical equipment. Forty- five percent (45%) of respondents said that the medical identity theft incident had a negative impact on their reputation, primarily because of embarrassment due to the disclosure of sensitive personal health conditions (89% of the

---

[25] Cathleen McCarthy, CreditCards, *How to Spot and Prevent Medical Identity Theft* (Aug. 19, 2014),http://www.creditcards.com/credit-card-news/spot-prevent-medical-identity-theft-1282.php (last visited July 29, 2018).

[26] Jaclyn Fitzgerald, *Ponemon Institute Study Reveals 21.7% Rise in Medical Identity Theft,* HC Pro (Mar. 2, 2015), http://www.hcpro.com/HIM-313785-865/Ponemon-Institute-study-reveals-217-rise-in-medicalidentity-theft.html (last visited March 16, 2019).

CLASS ACTION COMPLAINT

respondents), thirty-five percent (35%) said the person committing the fraud depleted their insurance benefits resulting in denial of valid insurance claims, and thirty-one percent (31%) said they lost their health insurance entirely as a result of the medical identity theft. Twenty-nine percent (29%) of the respondents reported that they had to make out-of-pocket payments to their health plan or insurer to restore coverage. Additionally, the study found that almost one-half of medical identity theft victims lose their healthcare coverage as a result of the identity theft, almost one-third have their insurance premiums rise, and forty percent (40%) were never able to resolve their identity theft.

68.     Notwithstanding the seriousness of the Data Breach, the UCONN has not offered to provide Plaintiffs and Class members any assistance or meaningful compensation for the costs and burdens—current and future—associated with the exposure of their PII/PHI.

69.     Moreover, it is incorrect to assume that reimbursing an individual for financial loss due to fraud makes that individual whole again.  On the contrary, after conducting a study, the U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."

70.     To date, the UCONN has offered patients nothing more than what any citizen is already entitled to under the law and is woefully inadequate in light of the nature of the Breach.[27]

> We have mailed notification letters to potentially impacted individuals for whom we have a valid mailing address. That notice includes information on steps individuals can take to protect themselves against potential fraud or identity theft. In addition, we are offering free identity theft protection services to individuals whose Social Security numbers may be impacted. As a general matter, we recommend that individuals regularly monitor credit reports, account statements and benefit statements.[28]

---

[27] See, https://www.usa.gov/credit-reports ("You are entitled to a free credit report from each of the three credit reporting agencies (Equifax, Experian, and TransUnion) once every 12 months")(Last visited March 4, 2019).
[28] https://health.uconn.edu/securityincident

CLASS ACTION COMPLAINT

71.     A free credit report and the ability to freeze their accounts is not only a right that every citizen enjoys, it is grossly inadequate to protect the Plaintiffs and Class members from the threats they face resulting from the PII/PHI that was exposed.  Moreover, although credit monitoring can help detect fraud after it has already occurred, it has very little value as a preventive measure and does nothing to prevent fraudulent tax filings. As noted by security expert Brian Krebs, "although [credit monitoring] services may alert you when someone opens or attempts to open a new line of credit in your name, most will do little — if anything — to block that activity. My take: If you're being offered free monitoring, it probably can't hurt to sign up, but you shouldn't expect the service to stop identity thieves from ruining your credit."[29]

72.     As a result of the UCONN's failures to prevent the Data Breach, Plaintiffs and Class members have suffered and will continue to suffer damages.  They have suffered or are at increased risk of suffering:

     a.  The compromise, publication, theft and/or unauthorized use of their PII/PHI;

     b.  Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

     c.  Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

     d.  The continued risk to their PII/PHI, which remains in the possession of UCONN and is subject to further breaches so long as UCONN fails to undertake appropriate measures to protect the PII/PHI in their possession; and

---

[29] Brian Krebs, *Are Credit Monitoring Services Worth It?*, KREBS ON SECURITY, (March 19, 2014), *http://krebsonsecurity.com/2014/03/are-credit-monitoring-services-worth-it/* (last visited February 13, 2019).

CLASS ACTION COMPLAINT

1      e.   Current and future costs in terms of time, effort and money that will be

2      expended to prevent, detect, contest, remediate and repair the impact of the

3      Data Breach for the remainder of the lives of Plaintiff and Class members.

4    73.   UCONN continues to hold the PII/PHI of its patients, including Plaintiff and Class

5  members. Particularly because UCONN has demonstrated an inability to prevent a breach or stop it

6  from continuing even after being detected, Plaintiff and Class members have an undeniable interest

7  in ensuring that their PII/PHI is secure, remains secure, and is not subject to further theft.

8               **CLASS ACTION ALLEGATIONS**

9    74.   Plaintiff seeks relief on behalf of herself and as representatives of all others who are

10  similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks

11  certification of a Nationwide class defined as follows:

12         All persons whose personally identifiable information and protected health
13         information was compromised as a result of the Data Breach announced by
            UCONN in February 2019 (the "Class").

14    75.   Excluded from the Class are UCONN and any of its affiliates, parents or subsidiaries;

15  all persons who make a timely election to be excluded from the Class; government entities; and the

16  judges to whom this case is assigned, their immediate families, and court staff.

17    76.   Plaintiff hereby reserves the right to amend or modify the class definitions with

18  greater specificity or division after having had an opportunity to conduct discovery.

19    77.   The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3)

20  and (c)(4).

21    78.   **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members

22  of the Class are so numerous and geographically dispersed that the joinder of all members is

23  impractical.  The Data Breach implicates at least 326,000 current and former UCONN Health

24  patients. UCONN has physical and email addresses for Class members who therefore may be

25  notified of the pendency of this action by recognized, Court-approved notice dissemination

26  methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

27

28

79.   **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include:

    a.   Whether UCONN had a duty to protect patient PII/PHI;

    b.   Whether UCONN knew or should have known of the susceptibility of its systems to a data breach;

    c.   Whether UCONN's security measures to protect their systems were reasonable in light of HIPAA requirements, FTC data security recommendations, and best practices recommended by data security experts;

    d.   Whether UCONN was negligent in failing to implement reasonable and adequate security procedures and practices;

    e.   Whether UCONN's failure to implement adequate data security measures allowed the breach of its data systems to occur;

    f.   Whether UCONN's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the unlawful exposure of the Plaintiff's and Class members' PII/PHI;

    g.   Whether Plaintiff and Class members were injured and suffered damages or other losses because of UCONN's failure to reasonably protect its systems and data network; and,

    h.   Whether Plaintiff and Class members are entitled to relief.

80.   **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class members.  Plaintiff is a UCONN Health patient whose PII/PHI was exposed in the Data Breach. Plaintiff's damages and injuries are akin to other Class members, and Plaintiff seeks relief consistent with the relief sought by the Class.

81.   **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class she seeks to

1    represent; is committed to pursuing this matter against UCONN to obtain relief for the Class; and

2    has no conflicts of interest with the Class. Moreover, Plaintiff's Counsel are competent and

3    experienced in litigating class actions, including privacy litigation of this kind. Plaintiff intends to

4    vigorously prosecute this case and will fairly and adequately protect the Class's interests.

5         82.    **Superiority. Fed. R. Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action

6    is superior to any other available means for the fair and efficient adjudication of this controversy,

7    and no unusual difficulties are likely to be encountered in the management of this class action. The

8    quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even

9    when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here,

10   the damages suffered by Plaintiff and the Class are relatively small compared to the burden and

11   expense required to individually litigate their claims against UCONN, and thus, individual litigation

12   to redress UCONN's wrongful conduct would be impracticable. Individual litigation by each Class

13   member would also strain the court system. Individual litigation creates the potential for

14   inconsistent or contradictory judgments and increases the delay and expense to all parties and the

15   court system. By contrast, the class action device presents far fewer management difficulties and

16   provides the benefits of a single adjudication, economies of scale, and comprehensive supervision

17   by a single court.

18        83.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule

19   23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds

20   generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to

21   the Class as a whole.

22        84.    **Rule 23(c)(4).** Particular issues under Rule 23(c)(4) are appropriate for certification

23   because such claims present only particular, common issues, the resolution of which would advance

24   the disposition of this matter and the parties' interests therein.  Such particular issues include, but

25   are not limited to:

26

27

28

a. Whether UCONN owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII/PHI;

b. Whether UCONN breached a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, using, transmitting, and safeguarding their PII;

c. Whether UCONN failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether UCONN timely, adequately, and accurately informed Class members that their PII/PHI had been disclosed without authorization; and,

e. Whether UCONN failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed and compromised in the Data Breach.

85. Finally, all members of the proposed Classes are readily ascertainable. UCONN has access to patient names and addresses affected by the Data Breach. Using this information, Class members can be identified and ascertained for the purpose of providing notice.

**COUNT I**
**NEGLIGENCE**

86. Plaintiffs restate and realleges paragraphs 1 through 85 above as if fully set forth herein.

87. UCONN's Notice of Privacy Practices acknowledges UCONN's duty to protect the PHH/PHI of its patients, which include Plaintiff and Class members.

88. Plaintiff and the Class members entrusted their PII/PHI to UCONN with the understanding that the UCONN would safeguard their information.

89. Defendants had full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiff and Class members could and would suffer if the PII were wrongfully disclosed.

90. Defendants had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to

unauthorized parties.  This duty includes, among other things, designing, maintaining and testing the Defendants' security protocols to ensure that Plaintiff's and Class members' information in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on cyber security measures regarding the security of student, parent guardian and employee personal information.

91.     Plaintiff and the Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew of or should have known of the inherent risks in collecting and storing the PII/PHI of Plaintiffs and the Class, the critical importance of providing adequate security of that PII/PHI, the current cyber scams being perpetrated on employers, and that it had inadequate employee training and education and IT security protocols in place to secure the PII/PHI of Plaintiff and the Class.

92.     Defendants' own conduct created a foreseeable risk of harm to Plaintiff and Class members. Defendants' misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included its decision not to comply with industry standards for the safekeeping and encrypted authorized disclosure of the PII/PHI of Plaintiff and Class members.

93.     Plaintiff and the Class members had no ability to protect their PII/PHI that was in UCONN's possession.

94.     Defendants were in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

95.     Defendants had a duty to have proper procedures in place to prevent the unauthorized dissemination Plaintiff and Class members' PII/PHI.

96.     Defendants have admitted that Plaintiff's and Class members' PII/PHI was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

97.     Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class members by failing to exercise reasonable care in protecting and safeguarding the Plaintiff's and Class members' PII/PHI while it was within the UCONN's possession or control.

98.     Defendants improperly and inadequately safeguarded Plaintiff's and Class Members' PII in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

99.      Defendants, through their actions and/or omissions, unlawfully breached its duty to Plaintiff and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of its patients' PII/PHI.

100.    Defendants, through their actions and/or omissions, unlawfully breached its duty to adequately disclose to Plaintiff and Class members the existence, and scope of the Data Breach.

101.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class members, Plaintiff's and Class members' PII/PHI would not have been compromised.

102.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII/PHI of current and former patients and the harm suffered or risk of imminent harm suffered by Plaintiff and the Class.

103.    As a result of  Defendants' negligence, Plaintiff and the Class members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing  and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

**COUNT II**
**BREACH OF CONTRACT**

104.    Plaintiffs restate and realleges paragraphs 1 through 85 above as if fully set forth herein.

105.    As set forth above, Plaintiff and Class Members received healthcare services from UCONN.

106.    As set forth above, the contract between Plaintiff and Class members and UCONN was supported by consideration in many forms including the payment of monies for healthcare services.

1      107.    Plaintiff and Class Members performed pursuant to these contracts, and satisfied all

2   conditions, obligations, and promises of the agreements.

3      108.    Under the contracts, UCONN were obligated, as outlined in the Privacy Practices, to

4   maintain the confidentiality of Plaintiff and Class Member's PHI and PII.

5      109.    As a result of UCONN's breach of contract, by failing to adequately secure Plaintiff

6   and Class Member's PHI and PII, Plaintiff and Class members did not receive the full benefit of the

7   bargain, and instead received services that were less valuable than described in the contracts.

8   Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference

9   in value between what was promised and what UCONN ultimately provided.

10     110.    Also as a result of UCONN's breach of contract, Plaintiff and Class Members have

11   suffered actual damages resulting from the theft of their PHI and PII, and remain at imminent risk of

12   suffering additional breaches in the future.

13

14                              **COUNT III**
                     **BREACH OF IMPLIED CONTRACT**
15

16     111.    Plaintiff restates and reallege paragraphs 1 through 85 above as if fully set forth

17   herein.

18     112.    Plaintiff and Class members were required to provide their personal information, to

19   UCONN as a condition of becoming a patient at UCONN Health.

20     113.    Implicit in the enrollment documents between UCONN Health and its patients was

21   the obligation that the information provided to it would be maintained confidentially and securely.

22     114.    Defendants have an implied duty of good faith to ensure that the PII/PHI of Plaintiff

23   and Class members in its possession were only used for purposes relevant to their interactions as

24   patients of UCONN Health.

25     115.    Defendants had an implied duty to reasonably safeguard and protect the PII/PHI of

26   Plaintiff and Class members from unauthorized disclosure or uses.

27     116.    Additionally, Defendants implicitly promised to retain this PII/PHI only under

28   conditions that kept such information secure and confidential.

117.    Plaintiff and Class members fully performed their obligations under the implied contracts with Defendants.  Defendants did not.

118.    Plaintiff and Class members would not have provided their confidential PII/PHI to the Defendants in the absence of their implied contracts with Defendants.

119.    Defendants breached the implied contracts with Plaintiff and Class members by failing to reasonably safeguard and protect Plaintiff's and Class members' PII/PHI, which was compromised as a result of the Data Breach

120.    Defendants breached their implied contracts with Plaintiff and Class members by failing to reasonably safeguard and protect Plaintiff's and Class members' PII/PHI, which was compromised as a result of the Data Breach.

121.    As a direct and proximate result of  Defendants' breach of its implied contacts with Plaintiff and Class members, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII/PHI is used; (ii) the compromise, publication, and/or theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach; (vi) the continued risk to their PII/PHI, which remain in the UCONN's possession and is subject to further unauthorized disclosures so long as the UCONN fails to undertake appropriate and adequate measures to protect the PII/PHI of Plaintiff and Class members  in its continued possession;  (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members; and  (viii) the necessity to engage legal counsel and incur attorneys' fees, cost and expenses.

CLASS ACTION COMPLAINT

**COUNT IV**
**NEGLIGENCE *PER SE***

122. Plaintiff restates and reallege paragraphs 1 through 85 above as if fully set forth herein.

123. Pursuant to HIPAA and the laws of numerous states, UCONN had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' medical information.

124. UCONN breached its duties to Plaintiffs and Class Members under the aforementioned laws by allowing confidential medical information to be accessed and compromised by an unauthorized third party.

125. UCONN's failure to comply with applicable laws and regulations constitutes negligence *per se*.

126. But for UCONN's negligent breach of their duties, Plaintiff and Class Members would not have been injured.

127. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of UCONN's breach of its duties. UCONN knew or should have known that it was failing to meet its duties, and that UCONN's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their confidential medical information.

128. As a direct and proximate result of UCONN's negligent conduct and/or negligent supervision, Plaintiff and Class Members have been injured and are entitled to damages.

**COUNT V**
**INVASION OF PRIVACY**

129. Plaintiff restates and reallege paragraphs 1 through 85 above as if fully set forth herein. Plaintiff and Class Members had a legitimate expectation of privacy to their PII and PHI and were entitled to the protection of this information against disclosure to unauthorized third parties.

130. The unauthorized release to, custody of and examination by unauthorized third parties of personal medical information and other personally identifiable information would be offensive to a reasonable person of ordinary sensibilities.

131.     UCONN owed a duty to its patients, including Plaintiff and Class Members, to keep their PII and PHI confidential.

132.     The Data Breach at the hands of UCONN constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

133.     As a proximate result of the above acts and omissions of UCONN, the PII and PHI of Plaintiff and Class Members was disclosed to and used by third parties without authorization, causing Plaintiff and Class Members to suffer damages.

**COUNT VI**
**DECLARATORY JUDGMENT**

134.     Plaintiff restates and realleges paragraphs 1 through 85 above as if fully set forth herein.

135.     As previously alleged, UCONN owes duties of care to Plaintiff and Class members that require it to adequately secure such PII/PHI.

136.     UCONN still possesses Plaintiff's and Class members' PII/PHI.

137.     In conjunction with alerting the public to the Data Breach, UCONN represented that it: (a) secured the impacted accounts to prevent further unauthorized access; (b) confirmed the security of its email system; (3) notified law enforcement; and (4) retained a forensic security firm to investigate. The announcement lacked any specificity and, moreover, was wholly insufficient to ensure the PII/PHI still in UCONN's possession is protected from further exposure.

138.     Accordingly, UCONN has not satisfied its contractual obligations and legal duties to Plaintiff and Class members.  In fact, now that UCONN's lax approach towards data security has become public, the PII in its possession is more vulnerable than before.

139.     Actual harm has arisen in the wake of the Data Breach regarding UCONN's contractual obligations and duties of care to provide data security measures to Plaintiff and Class members.

140.   Plaintiff, therefore, seeks a declaration that (a) UCONN's existing data security measures do not comply with its contractual obligations and duties of care, and (b) in order to comply with its contractual obligations and duties of care, UCONN must implement and maintain reasonable security measures, including, but not limited to:

    a.   engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on UCONN's systems on a periodic basis, and ordering UCONN to promptly correct any problems or issues detected by such third-party security auditors;

    b.   engaging third-party security auditors and internal personnel to run automated security monitoring;

    c.   auditing, testing, and training its security personnel regarding any new or modified procedures;

    d.   segmenting customer data by, among other things, creating firewalls and access controls so that if one area of UCONN is compromised, hackers cannot gain access to other portions of UCONN systems;

    e.   purging, deleting, and destroying patient data not necessary for its provisions of services in a reasonably secure manner;

    f.   conducting regular database scans and security checks;

    g.   routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

    h.   educating its patients about the threats they face as a result of the loss of their personal information to third parties, as well as the steps UCONN customers should take to protect themselves.

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests the following relief:

    i. An Order certifying this case as a class action;

    j. An Order appointing Plaintiff as the class representative;

    k. An Order appointing undersigned counsel as class counsel;

    l. A mandatory injunction directing the Defendants to hereinafter adequately safeguard the PII/PHI of the Class by implementing improved security procedures and measures;

    m. An award of damages;

    n. An award of costs and expenses;

    o. An award of attorneys' fees; and

    p. Such other and further relief as this court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: March 18, 2019        **GLANCY PRONGAY & MURRAY LLP**

              By:__/s/ Brian P. Murray_____
              Brian P. Murray
              230 Park Avenue, Suite 530
              New York, NY 10169
              Tel: (212) 682-5340
              Fax: (212) 884-0988
              Email: bmurray@glancylaw.com

              Jean Sutton Martin
              **MORGAN & MORGAN**
              2018 Eastwood Rd., Ste. 225
              Wilmington, NC 28403
              Telephone:  (813) 559-4908
              Facsimile:  (813) 222-4795
              Email:  jeanmartin@ForThePeople.com

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| YOSELIN MARTINEZ, on behalf of herself and all others similarly situated, | UNIVERSITY OF CONNECTICUT and UCONN HEALTH |

| **(b)** County of Residence of First Listed Plaintiff  New London | County of Residence of First Listed Defendant  Tolland |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
|  | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Glancy Pongay & Murray LLP<br>230 Park Avenue, Suite 530, New York, NY 10169<br>(212) 682-5340 |  |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
   Plaintiff

☐ 2 U.S. Government
   Defendant

☐ 3 Federal Question
   *(U.S. Government Not a Party)*

☒ 4 Diversity
   *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☐ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☒ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
   Proceeding

☐ 2 Removed from
   State Court

☐ 3 Remanded from
   Appellate Court

☐ 4 Reinstated or
   Reopened

☐ 5 Transferred from
   Another District
   *(specify)*

☐ 6 Multidistrict
   Litigation -
   Transfer

☐ 8 Multidistrict
   Litigation -
   Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)

Brief description of cause:
Defendant failed to protect Plaintiffs' confidential data against unauthorized access.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

DEMAND $
5,000,000.00

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*

JUDGE _____ DOCKET NUMBER _____

DATE
03/18/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____